708 A.2d 357

**Wayne Nelson DAVIS**

v.

**Bernadette DiPINO, et al.**

**No. 1855, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

April 16, 1998.

30

34

Peter Ayers Wimbrow, III, Ocean City, for appellant.

Guy R. Ayres, III, (Ayres, Jenkins, Gordy & Almand, P.A., on the brief), Ocean City, for appellees, DiPino and Moyer and City Council of Ocean City.

Julia M. Freit, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee Turner.

Argued before MURPHY, C.J., WENNER, CATHELL,* DAVIS, HARRELL, HOLLANDER, SALMON, EYLER, THIEME, SONNER, KENNEY and BYRNES, JJ., and ROBERT F. FISHER, Judge (retired, Specially Assigned).

HOLLANDER, Judge.

This case pits a citizen's constitutional rights to free speech, due process, and freedom from unreasonable seizures against an undercover police officer's interests in concealing her occupation and identity. Wayne Nelson Davis, appellant, brings his second appeal to this Court arising out of litigation that he initiated in 1991 in the Circuit Court for Worcester County against Ocean City Police Officer Bernadette DiPino, the Mayor and City Council of Ocean City ("Ocean City"), and District Court Commissioner Donald E. Turner, appellees.[1]

---

* Cathell, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court.

1. The circuit court initially granted summary judgment in favor of appellees, but Davis successfully challenged that ruling in the Court of Appeals. *Davis v. DiPino*, 337 Md. 642, 655 A.2d 401 (1995). The Court of Appeals held that this Court erred when it concluded that even though summary judgment was improperly granted, dismissal was nonetheless warranted because Davis failed to state a claim for relief. *See Davis v. DiPino*, 99 Md.App. 282, 637 A.2d 475 (1994). For a summary of the facts alleged in the original complaint, *see Davis*, 337 Md. at 644–647, 655 A.2d 401.

The suit challenged appellant's arrest and incarceration in July 1991 on charges that, in May 1991, he hindered two undercover police officers in the performance of their duties. The hindering charges resulted from appellant's public disclosure that DiPino and Alice Brumbley were undercover narcotics officers.

In his amended complaint, appellant lodged claims against appellees pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, claiming violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Additionally, Davis sued DiPino and Ocean City for violations of his rights under Articles 21, 24, 25, 26, and 40 of the Maryland Declaration of Rights. Appellant also presented intentional tort claims against DiPino and Ocean City for false arrest, false imprisonment, malicious prosecution, and abuse of process. Further, Davis sought to lodge a class action and an individual claim against Turner, claiming, *inter alia*, that he repeatedly violated Maryland Rule 4–212(d)(1) by issuing arrest warrants when summonses were appropriate. Appellant sought compensatory and punitive damages from DiPino and Ocean City and injunctive and declaratory relief against Turner.

DiPino and Ocean City jointly answered and asserted affirmative defenses of sovereign immunity, qualified immunity, good faith immunity, and statutory immunity. Turner moved to dismiss the amended complaint for failure to state a claim, and the court granted his motion. Eventually, in December 1995, the case against DiPino and Ocean City was tried to the court. At the close of appellant's case, the court denied DiPino's motion for judgment, granted judgment in favor of Ocean City on the federal § 1983 claims and the State intentional tort claims, and reserved as to the State constitutional tort claims against Ocean City. At the close of all the evidence, the circuit court heard argument only from appellant and, thereafter, it orally granted judgment in favor of "the Defense."

Appellant timely noted the instant appeal and presents the following issues for our *en banc* review, which we have rephrased slightly:

I. Was there probable cause to believe that appellant committed the crime of hindering?

II. Even if there was probable cause to believe that appellant committed the offense of hindering, did his arrest violate his constitutional right to free speech?

III. Did the trial court err when it granted Ocean City's Motion for Judgment at the conclusion of appellant's case on the intentional tort claims?

IV. Did the trial court err in admitting the testimony of Trooper Alice J. Brumbley when appellees did not supply her address or telephone number in discovery when it was available to them?

V. Did the trial court err in admitting testimony regarding a prior investigation of appellant?

VI. Did the trial court err in granting Commissioner Turner's motion to dismiss?

We hold that appellant was unlawfully arrested for the crime of hindering. In this regard, the circuit court erred in concluding that Officer DiPino had probable cause to believe that Davis had committed the offense of hindering. In our view, appellant's arrest in July 1991 also violated his State and federal constitutional rights to free speech. Accordingly, we shall vacate the judgments in favor of DiPino on the federal and State constitutional claims and remand the matter for further proceedings, including a consideration of appellees' immunity defenses.

As Davis was arrested without probable cause, we shall also vacate the judgments in favor of DiPino and Ocean City with regard to the malicious prosecution claim, and remand for further proceedings. We shall, however, affirm the judgments in favor of Ocean City with respect to the constitutional claims and the remaining intentional tort claims. Because the class action claim against Turner has not been preserved for our review, and appellant has failed in his individual capacity to

state a claim against Turner, we shall also affirm the judgments in favor of Turner. In light of our holdings, we need not consider appellant's discovery contention. Moreover, we decline to consider whether the court erred in admitting testimony about DiPino's original investigation of Davis.

## Factual Summary

In May 1991, DiPino and Brumbley were employed by the Ocean City Police Department as undercover narcotics detectives.[2] Approximately one year earlier, when DiPino and Brumbley were attempting to make contact with possible narcotics suspects, they met Davis, a long-time Ocean City resident who was then in his mid-forties, as he was riding his bicycle along the boardwalk. According to the officers, appellant expressed an interest in purchasing marijuana. Although appellant denied this allegation, the parties nonetheless agree that, as a result of the encounter on the boardwalk, Davis became the target of a "reversal," whereby an undercover officer tries to sell a controlled dangerous substance to someone suspected of involvement with drugs.

Soon thereafter, Davis met DiPino, Brumbley, and Gary Holtzman at the Inlet Lodge, where Davis had been working for many years as a bartender, and at the Embers Restaurant. Davis recognized Holtzman, an Ocean City police sergeant, because Davis's child and Holtzman's child were schoolmates. He then informed DiPino and Brumbley that Holtzman was actually a police officer. DiPino testified: "I went around to talk to Mr. Davis, and Mr. Davis warned me about Sergeant Holtzman. He said he believed that he was ... a police officer and to be careful."

As a result of the disclosure concerning Holtzman, DiPino assumed that Davis knew that she, too, was a police officer, and that the sanctity of her cover had been jeopardized. Consequently, DiPino decided to abandon her investigation of Davis because it was "pretty moot." She explained: "At that

---

2. By the time of trial in 1995, DiPino had been promoted to the rank of sergeant, and Brumbley was employed by the Delaware State Police.

point, I really felt we didn't have anywhere else to go in this case, because trust, and not believing that you're a police officer, is a key to a narcotics investigation."

By happenstance, about a year later, during the late evening hours of Sunday, May 11, 1991, or the early morning hours of Monday, May 12, 1991, DiPino and Brumbley encountered appellant, who was with his friend, Frederick King, in the vicinity of Wicomico Street and the boardwalk. According to the police officers, Wicomico Street is heavily populated with drug users, drug sellers, and "biker gangs." The officers had just left The Cork Bar where, in their undercover capacities, they had met with two "targets."

Appellant testified that, on the night in question, he met King, a purveyor of such items as cotton candy and funnel cakes, when King was closing the family store, known as "Kingie's." At around 1:00 a.m., appellant and King were chatting at appellant's car, on the north side of Wicomico Street, when appellant saw DiPino and Brumbley emerge from a sandwich shop on the south side of Wicomico Street, which was located between The Cork Bar and The Bearded Clam, about 65 feet away. After Davis made eye contact with DiPino and Brumbley, Davis testified that he said to King, in a normal conversational tone:

> "Look, those were the two girls that were going to come in last year and give me some pot and have Mr. Holtzman bust me", right? And Mr. King said, "What are they? Narcs?" And I says, "I don't know what they are." I says, "They could be under cover or anything." [3]

Appellant testified further that the two women then walked across the street, and the following colloquy ensued:

> Mrs. DiPino said to me, she said, "What are you talking about? Us?" And I said, "No, I'm not talking about you. I was talking about business." She said, "Well, that's what

---

**3.** At trial, appellant initially denied that he knew the two women were undercover police detectives. In his deposition testimony and in an affidavit submitted pre-trial, however, he had acknowledged that, at the time of the occurrence, he knew the two women were police officers.

I'm interested in is your business." And I said to her, I said, "You know what my business is?" She said, "What is that?" I said, "None of your business." That was the only conversation taken [sic] between me and Mrs. DiPino.

According to appellant, there was little activity on the street at that time. After the conversation, the officers entered a white Mustang and drove away. Thereafter, Davis went to The Bearded Clam, which had about 14 patrons in it at the time.

King corroborated that he met with appellant after he closed his store. He explained that he sells the kind of food that people eat when it is late, so he usually is among the last persons to close a store on the boardwalk. As it was early in May, he stated that "[t]here wasn't hardly anybody around." He added: "I think we were the only ones on Wicomico Street."

While King and Davis were talking, King said that "Mr. Davis nodded over and he said, 'There's two girls in the sub shop where one's [sic] tried to sell me some weed.' And I said, 'What are they? Narcs?' And he goes, 'I don't know what they are.'" Although a conversation then ensued between Davis and one of the women, he had no recollection as to what was said.

In the defense case, Officer Brumbley explained that, on the evening in question, she and DiPino had worked undercover at The Cork Bar. When they left that establishment, the officers began to walk toward their car, which was parked on the other side of Wicomico Street. While crossing the street, Brumbley became alarmed because she heard Davis "make a statement about, 'Those girls,' 'narc', 'undercover detectives', 'undercover officers', were the words that I saw coming out of his mouth," in a voice "loud enough that I clearly heard him at a distance of nine to ten feet." She added: "Wicomico Street is perhaps one of the busiest streets in Ocean City on one of the loudest parts of the boardwalk. And ... over all ... of the noise of the three bars on that street, I still heard him quite clearly." Brumbley did not recall a lot of people on Wicomico Street,

however. Moreover, while several people were on the board-walk in front of The Cork Bar, she conceded that she did not see the two targets with whom she had just met.

In her testimony, Officer DiPino related two earlier contacts with Davis in 1990. As to one, over defense objection, she recounted the basis of her suspicions that Davis was involved with marijuana and perhaps other controlled dangerous sub-stances. She also testified that she had engaged in a conver-sation with appellant in 1990 on the boardwalk, which led to an unsuccessful effort to arrange a drug transaction with Davis.

DiPino's account about the night in issue paralleled Brum-bley's version of events. DiPino stated that she and Brumbley met with two targets at The Cork Bar during the evening of May 12, 1991 and, after leaving the bar, she noticed appellant as she started to cross Wicomico Street. DiPino explained: "[A]s we started to cross the street—we were about in the middle of the street—I heard Mr. Davis clearly say, and it was in a very loud voice, um, 'Those girls are undercover cops. Those girls are "narcs" ' ". In further describing Davis's voice, DiPino said that it was "very much ... louder" than a normal conversational tone. She testified:

> It was very loud. I could hear it very loudly. And I believe by the looks that I got from the bikers and the people that were standing in front of the Bearded Clam that they also heard what he was saying. *And it was in a loud, distinctly loud voice, in my opinion, intended to blow our covers.*

(Emphasis added). DiPino added: "I was concerned that he had blown our cover. And I said to him, 'You better watch how loud you're saying things. You don't know who's listen-ing.'" She also believed appellant "distinctly meant to blow our covers."

Although DiPino acknowledged that the area was beginning "to wind down," she claimed that she immediately turned to look toward The Bearded Clam and saw several bikers stand-ing outside, as well as a bouncer named Jeff, who was another "target" suspected of selling marijuana. According to DiPino, "the bikers gave us dirty looks. I was really concerned about

our safety." The two targets with whom DiPino had just met had already left the area by the time of the incident. Nevertheless, DiPino asserted that "anybody that was standing out on the street was a potential . . . target."

After the encounter with appellant, DiPino and Brumbley got in their car and drove to the police station. At the time of the incident, DiPino "believed that there was a crime that had been committed, but [she] wasn't exactly sure what it was or if Maryland even had a law to match what had just taken place." At the station, the officers discussed the incident with other officers who had experienced similar problems with having their covers "blown."

DiPino also explained the importance of her "cover" to her personal safety, to the integrity of her investigations, and to her ability to continue to work undercover. Although DiPino believed that both her safety and the investigation had been "jeopardized," and she was unsure if a crime had been committed, DiPino never contacted the State's Attorney to discuss the incident. Instead, she spoke with a court commissioner and learned that Davis could be charged with the crime of hindering. Nevertheless, notwithstanding the "extreme danger" that DiPino believed appellant had created, the matter "kind of got put on the back burner."

On July 5, 1991, almost two months after the incident, and during one of the busiest weekends of the beach season, DiPino filed an Application for Statement of Charges. In the Application, she averred that appellant had stated the following to an unknown white male: " 'Look those two girls are narcs' . . . in a loud enough voice as so [sic] the Det,s, [sic] approximately 3 yards away, could hear and any passerby could also hear" thereby "placing the Det's. in extreme danger and compromising their cover." Upon review of the application, Commissioner Turner determined to issue an arrest warrant, rather than a summons.[4]

---

**4.** Appellant's home address appeared on DiPino's application. In *Davis v. DiPino,* 99 Md.App. at 294, 637 A.2d 475, *rev'd on other grounds,* 337

DiPino attributed her lengthy delay in pursuing charges to her involvement in two other undercover investigations that she felt were more pressing. Yet during the period between May 12, 1991 and July 5, 1991, DiPino acknowledged that she had filed charges in other cases. She also conceded that only minimal time is needed to complete the necessary paperwork. In submitting the application for charges, DiPino insisted that she acted without malice and in the belief that she had probable cause to apply for the statement of charges.

On the evening of Saturday, July 6th, 1991, while appellant was at work at the Inlet Lodge during a crowded holiday weekend, he was arrested on charges of "obstructing & hindering," pursuant to the statement of charges and warrant issued by Commissioner Turner. Commissioner Turner set bail at $50,000. Unable to post the bail immediately, appellant spent two nights in jail. In October 1991, on the day set for Davis's criminal trial, the State entered a *nolle prosequi* as to all charges.

At the close of evidence in the underlying civil suit, appellant's counsel contended that DiPino "never had probable cause to believe [appellant had] committed a crime." He pointed to the lack of evidence that DiPino was engaged in the performance of duty at the time of the incident, asserting that only if everyone on the street were considered a target could the officers have been engaged in the performance of their duties. Counsel stated: "You can't tell me they're engaged in buying drugs and investigating drugs every minute that they have a pair of jeans and a tee shirt on." Moreover, even if the officers were engaged in the performance of their duties as undercover police officers, appellant's counsel argued that

Md. 642, 655 A.2d 401 (1995), we rejected as unfounded appellees' claim that there was a "substantial likelihood" that Davis would not respond to a summons. We acknowledged, however, that there is no constitutional requirement compelling the issuance of a summons, and held that "civil actions for declaratory or injunctive relief are not among the consequences of noncompliance with Rule 4–212." *Id.* Nevertheless, we were "persuaded that Commissioner Turner should have issued a summons in this case." *Id.* at 293, 637 A.2d 475; *see also* Md. Rule 4–212(d)(1).

there was no evidence that appellant *knew* that the officers were so engaged, which was critical to a probable cause finding. With regard to the element of intent, appellant's counsel asserted: "[H]ow can he have an intent to obstruct her investigation of something about which he knows nothing?" The circuit court judge replied, "Why would he have said it in such a loud voice to do other than that?" Davis's counsel also contended: "It's not a crime to say—to say the truth. It's not a crime to say 'That person's a lawyer,' 'That person's a judge,' 'That person is a police officer.' That's not a crime."

The circuit court expressly found that Davis and King were not credible witnesses, but that the police officers were believable. The court then determined that Officer DiPino had probable cause to believe that appellant committed the crime of hindering. No evidence as to damages was deemed necessary by the court, and the court did not reach the applicability of the immunity defenses. Apparently concluding that a finding of probable cause was dispositive of all issues, the court entered judgment "for the Defense," without addressing appellant's free speech claim or the intentional tort claims. The court said:

> I mean, I think it was plain from my comments how I was going to rule. So I appreciate not having to listen to damages when it was obvious that I wasn't going to award a judgment.

We shall include additional facts in our discussion of the issues.

## Discussion

### I.

Appellant asserted, *inter alia*, that appellees committed a variety of intentional torts and violated his federal and State constitutional rights to due process, free speech, and the right to be free from an unreasonable seizure of his person. As we noted, Davis sought redress based on 42 U.S.C. § 1983; the Maryland Declaration of Rights, including Articles 24, 26, and

40; and Maryland common law. After determining that appellant's arrest was founded on probable cause, the trial court ruled "for the Defense" in all respects.

 When the trial court sits as the trier of fact, our review of its factual findings is governed by the "clearly erroneous" rule embodied in Md. Rule 8–131(c). *See Barnes v. Children's Hosp.*, 109 Md.App. 543, 552–53, 675 A.2d 558 (1996); *Kelly Catering, Inc. v. Holman,* 96 Md.App. 256, 269, 624 A.2d 1300 (1993), *aff'd,* 334 Md. 480, 639 A.2d 701 (1994). So long as the trial court's factual findings are supported by "any competent, material evidence," then we cannot set those findings aside as clearly erroneous, "even if we might have found otherwise." *Barnes,* 109 Md.App. at 553, 675 A.2d 558. Moreover, we must view the evidence, and all inferences fairly deducible from the evidence, in the light most favorable to the prevailing party. *Id.* On the other hand, as a reviewing court, it is not appropriate for us to make factual findings concerning matters that the trial court did not address or resolve.

 In contrast, when we review a trial court's conclusions of law, we are not bound by the clearly erroneous standard. *Woodfin Equities Corp. v. Harford Mut. Ins.* Co., 110 Md. App. 616, 643, 678 A.2d 116 (1996), *aff'd in part and rev'd in part on other grounds,* 344 Md. 399, 687 A.2d 652 (1997); *Barnes,* 109 Md.App. at 553, 675 A.2d 558. Instead, our review of a trial court's legal conclusions is expansive; we must determine if the trial court's decision was legally correct. *See In re Michael G.,* 107 Md.App. 257, 265, 667 A.2d 956 (1995); *Van Wyk, Inc. v. Fruitrade Int'l, Inc.,* 98 Md.App. 662, 669, 635 A.2d 14 (1994).

We turn to consider whether the court was legally correct in its resolution of the legal questions presented at trial. At the outset, we note that it is well established that Maryland permits a common law claim for damages to redress violations of State constitutional rights. *Ashton v. Brown,* 339 Md. 70, 101, 660 A.2d 447 (1995); *Ritchie v. Donnelly,* 324 Md. 344, 369–70, 597 A.2d 432 (1991). In this regard, we are mindful that Article 24 and Article 26 of the Maryland Declaration of

Rights "were intended to preserve individual liberty ... interests." *Widgeon v. E. Shore Hosp. Ctr.,* 300 Md. 520, 536, 479 A.2d 921 (1984). Thus, both Articles "have consistently been held to be 'in pari materia' with or 'equated with' the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution...." *Id.* at 532, 479 A.2d 921. Moreover, Article 40, which is comparable to the First Amendment, creates State constitutional protections for freedom of expression.

 The Due Process Clause in Article 24 is considered the equivalent of the due process guarantees in the Fifth and Fourteenth Amendments to the United States Constitution. *See, e.g., Horace Mann League v. Board of Pub. Works,* 242 Md. 645, 685, 220 A.2d 51, *cert. denied,* 385 U.S. 97, 87 S.Ct. 317, 17 L.Ed.2d 195 (1966). Article 26 is Maryland's counterpart to the Fourth Amendment. *See Gadson v. State,* 341 Md. 1, 8 n. 3, 668 A.2d 22 (1995), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996); *Gahan v. State,* 290 Md. 310, 319–20, 430 A.2d 49 (1981); *State v. Meade,* 101 Md.App. 512, 517 n. 1, 647 A.2d 830 (1994), *cert. denied sub nom. Bewley v. Meade,* 337 Md. 213, 652 A.2d 669 (1995). Like the Fourth Amendment, Article 26 prohibits "unreasonable" searches and seizures, *see Pinkney v. State,* 12 Md.App. 598, 608–09, 283 A.2d 800 (1971), but it "does not afford ... any greater protection than ... the Fourth Amendment." *Henderson v. State,* 89 Md.App. 19, 24, 597 A.2d 486 (1991), *cert. denied,* 325 Md. 396, 601 A.2d 129 (1992).

 We also observe, preliminarily, that federal law governs any claims and defenses based on 42 U.S.C. § 1983. *Ritchie,* 324 Md. at 353, 597 A.2d 432. Generally, § 1983 authorizes suit against a "person" who, under color of state law, deprives the plaintiff of a federally protected right. *Id.* at 354, 597 A.2d 432. Section 1983 states, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privi-

leges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

 In order to establish a § 1983 claim, the following "essential elements" must be proved: "(1) that the defendant was acting under color of state law in the actions complained of; and (2) that the defendant deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Clark v. Link,* 855 F.2d 156, 161 (4th Cir.1988). If there is no violation of a federal right, then there is no basis for a § 1983 action. *See Screws v. United States,* 325 U.S. 91, 108, 65 S.Ct. 1031, 1038–39, 89 L.Ed. 1495 (1945); *Mensh v. Dyer,* 956 F.2d 36, 39 (4th Cir.1991); *Clipper v. Takoma Park,* 876 F.2d 17, 19 (4th Cir.1989). Section 1983 does not confer any substantive rights, however. *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). We shall discuss § 1983 in more detail, *infra.*

## II.

### A.

 We first consider appellant's claim that his State and federal constitutional rights were violated because his arrest for hindering was not based on probable cause. Probable cause is a "non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281 (1988). Probable cause means "facts and circumstances 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)); *see also State v. Smith,* 305 Md. 489, 515 n. 10, 505 A.2d 511, *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 552 (1986). This standard represents "a necessary accommodation be-

tween the individual's right to liberty and the State's duty to control crime". *Gerstein,* 420 U.S. at 112, 95 S.Ct. at 862. Further, probable cause "is based on the factual and practical considerations of everyday life on which reasonable people act and is assessed by considering the totality of the circumstances in a given situation." *Howard v. State,* 112 Md.App. 148, 160–61, 684 A.2d 491 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997); *see also Potts v. State,* 300 Md. 567, 575, 479 A.2d 1335 (1984) (stating that "probable cause does not demand the certainty associated with formal trials; it is sufficient that a 'fair probability' existed . . .").

■■■■■■ Under federal and State constitutional law, probable cause to arrest is determined based on an objective standard. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Little v. State,* 300 Md. 485, 494, 479 A.2d 903 (1984). When, based on an objective standard, a reasonable police officer would know that the facts relied upon to establish probable cause, even if true, are nonetheless insufficient to constitute probable cause, the arrest violates the Fourth Amendment. *See Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986).

As a threshold matter, Davis had the burden of proving, by a preponderance of the evidence, that his arrest for hindering was not supported by probable cause. If there was probable cause for the arrest, then appellant cannot prevail with respect to his constitutional claims based on the Fourth Amendment or Article 26. If there was no probable cause, however, an evaluation of appellee's defenses, which the court below did not undertake, would be required.

**B.**

In order to determine whether appellant's arrest for hindering was supported by probable cause, we begin by examining the offense itself. Many states have codified the crime of hindering, which is commonly referred to as obstructing a police officer. Note, *Types of Activity Encompassed by the*

*Offense of Obstructing a Public Officer,* 108 U. Pa. L.Rev. 388
n.1 (1960). In Maryland, however, hindering a police officer in
the performance of his or her duties remains a common law
offense. *See Busch v. State,* 289 Md. 669, 675, 426 A.2d 954
(1981); *Roddy v. Finnegan,* 43 Md. 490, 505 (1876).

In *Cover v. State,* 297 Md. 398, 466 A.2d 1276 (1983), the
seminal case in Maryland on hindering, the Court of Appeals
analyzed the offense in the context of an undercover police
officer.[5] There, a policeman was conducting early morning
surveillance of a subject in a phone booth who was suspected
of planning a restaurant burglary. *Id.* at 400, 466 A.2d 1276.
As the officer pulled his car into the parking lot near the
phone booth, the suspect disappeared from view. *Id.* at 402,
466 A.2d 1276. Cover, who was in an automobile, followed the
officer into the parking lot. When the suspect re-appeared in
front of the restaurant, the officer approached Cover, told her
he was a police officer, and instructed her to leave the parking
lot by a certain exit. He also advised Cover that if she left by
the exit closest to the restaurant, she would be hindering his
investigation. *Id.* at 403, 466 A.2d 1276. Although Cover
initially complied with the officer's request, she then reversed
her automobile, returned to the parking lot, and left from the
exit closest to the restaurant. When she passed the suspect,
there was no evidence of any conversation. *Id.* at 403–04, 466
A.2d 1276. After the car passed from the officer's sight,
however, the officer heard a persistent honking of a car horn.
As Cover's car emerged into view, the officer realized the

---

5. Undercover methods were first used in the Reconstruction era to
ensure compliance with unpopular laws, such as civil rights laws.
Gary T. Marx, *Undercover: Police Surveillance in America* 30 (1988).
When the Federal Bureau of Investigation was established in 1908, it
made only modest use of undercover operations in countering conven-
tional crime; instead, it primarily used covert methods in political
cases. Undercover police work began in earnest in the early 20th
century, when urban police departments began to use covert means to
counter "vice, alcohol, narcotics, gambling, labor, and radicals." *Id.* at
25. According to Marx, the United States was slow to embrace covert
police activities because of the country's uneasiness with the kind of
state-sanctioned deception inherent in undercover work. *Id.* at 33.

honking emanated from Cover's car. *Id.* at 404, 466 A.2d 1276.

Cover was convicted of hindering on the theory that the honking of the horn served to alert the suspect to the presence of the police. The Court of Appeals reversed, however, concluding that the evidence was legally insufficient to convict. *Id.* at 414, 466 A.2d 1276. It reasoned that the defendant's act of blowing a car horn could not have been construed by the subject as a warning of police presence, and it was unreasonable and speculative to infer a warning based on the facts presented. *Id.* at 414–15, 466 A.2d 1276.

In reaching its conclusion, the Court surveyed the various permutations of the offense of hindering, including "positive indirect obstruction," which is the category relevant here. This occurs in

[t]hose cases in which "the police are not acting directly against the citizen but are acting indirectly against other citizens who are, or may be, about to commit offences [sic] against the criminal law, and the citizen does an act which obstructs them in their general duty to prevent or detect crime, intending to frustrate the police operation."

*Id.* at 406, 466 A.2d 1276 (quoting Lidstone, *The Offence of Obstruction: (2) Obstructing Freedom?*, Crim. L.Rev. 29 (1983)).

After summarizing cases involving persons charged with warning others of the presence of the police, under statutes analogous to Maryland's common law offense, the Court articulated the following elements of the crime of hindering a police officer:

(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused of facts comprising element (1); and

(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2).

*Id.* at 413, 466 A.2d 1276; *see also In re Antoine H.*, 319 Md. 101, 104, 570 A.2d 1239 (1990); *Glover v. State*, 88 Md.App. 393, 404 n. 3, 594 A.2d 1224 (1991); *Sibiga v. State*, 65 Md.App. 69, 80–81, 499 A.2d 484 (1985).

The elements are critical to our analysis. The first element of hindering actually contains two parts: a) there must be a police officer, and b) the police officer must be acting in the performance of a duty. The third element concerns knowledge by the accused. It is at once apparent, upon review of *Cover*, that it is not enough if a defendant knows only that the person in question is a police officer. Rather, the defendant must also know that the police officer is engaged in the performance of a duty. It is obvious that one cannot know whether a police officer is engaged in the performance of duty without also having knowledge that the person in question is actually a police officer. On the other hand, one may know that a person is a police officer without necessarily knowing whether the officer is engaged in the performance of duty. This important distinction undergirds our analysis.

█ Applying *Cover*, we are of the view that, in order for the trial court to have found probable cause, it had to conclude, *inter alia*, that a reasonable officer in DiPino's position would have believed not only that Davis knew the women were police officers, but also that they were then engaged in the performance of their duties. Conversely, if no reasonable police officer would have believed that Davis knew DiPino or Brumbley was engaged in the performance of duty as they crossed Wicomico street, then there was no probable cause.[6]

---

6. We observe that none of the parties presented any expert testimony as to what a reasonable officer would have thought, based on the facts known to the officer. Nor do appellees now assert that appellant's claim must fail because of this omission. Therefore, we do not express any opinion as to whether appellant should have presented expert testimony, because this issue is not before us. Md. Rule 8–131(a). We note, however, that the determination of probable cause is ordinarily a question of law. Moreover, on the basis of this record, we are satisfied

We do not quarrel with the trial court's findings that Davis and King were not credible, that the officers were believable, that Davis knew that DiPino was a police officer, or that Davis deliberately sought to reveal DiPino's occupation. Neither do we perceive that the trial court was clearly erroneous in finding that DiPino reasonably believed that Davis knew she was a police officer. Furthermore, we shall assume, *arguendo*, that the officers were engaged in the performance of their duties at the time Davis uttered his remarks.[7] That leaves us with the question that we consider dispositive: Did DiPino have probable cause to believe that *Davis knew* she was engaged in the performance of a duty when he made his remarks? As we see it, the answer to this critical question is a resounding "no."

*Cover* makes clear that it is not enough that the officers were engaged in the performance of duty. To the contrary, appellant had to possess sufficient knowledge as to performance of duty. Moreover, based on our review of the trial court's comments, it appears that the trial judge misconstrued the third element in *Cover*. He appears to have determined, as to the third element, that the evidence only had to show that Davis knew DiPino was a police officer. The judge stated: "I've already gone through 1 and 2. 3: [Knowledge] by the accused of facts comprising element number 1 which is that they were police officers." Again, Davis's knowledge of DiPino's occupation is not coextensive with knowledge of performance of duty; they are clearly distinct components of the third element. Yet the court neither found nor acknowl-

---

that expert testimony was not essential to appellant's case, although it surely would have enhanced Davis's presentation.

7. We observe that the Court in *Cover* assumed that the officer was engaged in the performance of his duty. The Court said:

In order for the facts of Cover's case to include the "duty" element of the common law offense, "duty" would have to be defined to embrace an officer's undertaking the surveillance of lawful, *i.e.*, non-criminal, activity. We shall assume, for purposes of the case at hand, that the duty element has that broad a scope.

*Cover*, 297 Md. at 413, 466 A.2d 1276.

edged the requirement that the accused must also know the officer is engaged in the performance of duty.

The court's omission is particularly significant in view of the dearth of evidence showing that DiPino was engaged in the performance of duty, or that Davis had such knowledge, or that DiPino reasonably believed appellant knew she was engaged in the performance of duty. Certainly, there was nothing suggesting performance of duty based on the officers' appearance or their conduct. The evidence showed little more than two women, at about 1:00 a.m., walking together across a street in the boardwalk area of Ocean City, in the vicinity of several popular bars, in order to get to their car. While the officers may have been in a high drug area, there was not a shred of evidence that appellant knew it was that kind of area.

*Cover* is useful by comparison, because its facts highlight the deficiencies in this case. Unquestionably, the defendant in *Cover knew* that the officer considered himself engaged in the performance of duty, because the officer specifically told Cover who he was, instructed her to undertake certain actions so as not to interfere with his work, and expressly warned her that if she failed to follow his directive, she would be hindering him. None of those circumstances was present here. Applying an objective standard to the facts of this case, a reasonable police officer could not have believed that Davis knew the officers were engaged in their duties at the time he uttered his fateful remarks.

Appellees essentially advocate an expansive definition of "performance of duty" that would extend to a citizen's chance encounter with an undercover officer at such places as a movie theater, a restaurant, or the beach, when the officer is actually off duty or even on vacation. We decline to fashion a rule that one who knows a person is a police officer is automatically charged with knowledge that the police officer is acting in the performance of duty, regardless of what the officer is doing— whether the officer is in church, at the doctor's office, in a restaurant, at the movies, or lounging on the beach.

As we see it, it was not objectively reasonable for DiPino to believe that she had probable cause to charge Davis with the offense of hindering. Nor do we believe that "officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2nd Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). Any conclusion to the contrary, based on the facts presented here, was clearly erroneous.

## C.

Even if DiPino reasonably believed that appellant knew she was engaged in the performance of duty, we remain convinced that DiPino lacked probable cause to secure appellant's arrest. This is because appellant's act of speaking out, under the circumstances attendant here, did not constitute an *act* of hindering.

Appellees seemingly contend that appellant's conduct constituted an act of hindering because the State has an absolute, unfettered right to prevent citizens from disclosing an undercover police officer's actual identity. Appellees' argument is tantamount to an assertion that one may never lawfully disclose an undercover officer's true occupation, regardless of the circumstances. Whenever a citizen on a public street recognizes an undercover police officer and says "hello, officer," the citizen, under appellees' theory, would commit an act of hindering. We do not believe appellees' position is consistent with existing case law.

The reported cases in Maryland at the time that *Cover* was decided involved direct acts of hindering. *See, e.g., Roddy,* 43 Md. at 500–05 (refusing to cooperate with police investigation); *Howard v. State,* 32 Md.App. 75, 359 A.2d 568 (1976) (assaulting an officer who was attempting to arrest defendant's wife). Thus, in analyzing the issues presented, the *Cover* Court looked to other jurisdictions that had considered positive indirect obstruction of an undercover officer, which the Court recognized fell in the "relatively unexplored regions" of the

offense. *Cover,* 297 Md. at 405, 466 A.2d 1276. The Court noted in *Cover* that some jurisdictions have held that a defendant cannot be convicted of hindering absent evidence that the defendant interfered with an illegal act by a third person, because only then, for hindering purposes, is the officer engaged in the performance of his duties.

The *Cover* Court did not resolve whether, in order to commit "positive indirect obstruction," a third party must actually be in the midst of committing a crime. The Court stated that,

> to reach the indirect type of conduct which formed the basis for the conviction at the case at bar, it is necessary to define an act of hindering to include an act which deprived [the officer] of the opportunity of seeing whether, in normal circumstances, the unidentified subject would attempt to break and enter the Wagon Wheel Restaurant.... We shall assume, *arguendo,* that the common law crime embraces such a broad concept.

*Cover,* 297 Md. at 414, 466 A.2d 1276. Since *Cover,* however, our research reveals that several other courts have required that, in order for revealing an undercover officer's identity to constitute the crime of hindering, a third party must actually be in the process of committing a crime.[8]

In *State v. Jelliffe,* 5 Ohio Misc.2d 20, 449 N.E.2d 810 (Mun.1982), the defendant saw a man in street clothes at a rock concert whom he recognized as a police officer. The defendant was arrested when the officer heard the defendant reveal that the man was "a cop." The trial court acquitted the defendant, stating: "Here the statement was not made to a

---

**8.** Contrary to the dissent's assertion, we have not said that the "right to blow the cover of an undercover officer" is "clearly established." We have said that *Cover* "clearly established" the elements of the common law offense of hindering, and that DiPino's Application did not satisfy *Cover.* Moreover, in discussing what constitutes an "act" of hindering, we pointed out that *Cover* did *not* decide whether a third party must be engaged in an illegal activity before a defendant can be said to obstruct or hinder a police officer.

police officer, but about a police officer, and the statement was in fact true." *Id.*, 449 N.E.2d at 811.

The case of *State v. CLR*, 40 Wash.App. 839, 700 P.2d 1195 (1985), is also instructive. There, a minor was convicted under an ordinance that made "it a misdemeanor to knowingly obstruct, hinder, or delay a public servant in the discharge of his official duties." *Id.*, 700 P.2d at 1197. The defendant saw an undercover police officer speaking with a woman and realized the man was a police officer. According to the officer's testimony, the woman had agreed to engage in an act of prostitution with the officer and, as she opened the passenger side door of the officer's vehicle, the defendant, who was across the street, shouted "he's vice." *Id.*, 700 P.2d at 1196. The woman then closed the car door and began to walk away. The woman was arrested for solicitation and the defendant was arrested for hindering. The State argued that although the officer had made the actual arrest in that case, the officer's "future undercover work *may have been* hindered by exposure of his identity." *Id.*, 700 P.2d at 1197 (emphasis in original).

The court found the evidence of hindering insufficient. It reasoned that, from across the street, the defendant could not have heard the woman agree to engage in an act of prostitution, and thus could not have known that a crime was being committed or that the officer would be making an arrest. Further, as the officer was able to effect the arrest, the defendant could not have hindered him. The court also concluded that speculative future harm, which might flow from disclosure of the officer's identity, was insufficient to constitute hindering. *Id.* Moreover, the court determined that the state failed to show that the defendant knew that the officer was engaged in the course of his duties. *Id.*[9]

---

**9.** Interestingly, the court cited to both *Cover* and *Jelliffe* and interpreted both cases to "require an illegal activity at the time of the warning in order for the warning to be illegal under the obstruction statutes or common law." *CLR*, 700 P.2d at 1198.

*Westin v. McDaniel,* 760 F.Supp. 1563 (M.D.Ga.1991), *aff'd,* 949 F.2d 1163 (11th Cir.1991), is also noteworthy. There, an attorney representing two confidential informants greeted an undercover police officer in a bar, in a conversational tone, by using the officer's real name. Given the setting, the officer denied that was her name, and then spoke with the attorney privately in another room. Later, the officer believed that patrons in the bar were acting "strangely" towards her, and she thought "her cover had been blown." *Id.* at 1564. Consequently, the lawyer was arrested on charges of violating the State's hindering statute. After the charges were dropped, the District Attorney convened a grand jury to recharge the attorney. As a result, the attorney filed suit to obtain, *inter alia,* injunctive relief, pursuant to 42 U.S.C. § 1983.

The federal district court concluded that the attorney's conduct did not constitute an act of hindering. It stated that the lawyer's "identification of [the officer], which has all the markings of an innocent mistake, and the subsequent conversation are certainly protected speech...." *Id.* at 1572. Moreover, the court found that there was "no reason to believe that Westin's words put [the officer] in any danger or that they were overheard by anyone else in the bar...." *Id.*

The foregoing cases, like the one *sub judice,* are markedly distinct from cases in which a person accused of hindering actively and knowingly interferes with an officer's actual and obvious performance of duty. In *California v. Robles,* 48 Cal.App.4th Supp. 1, 56 Cal.Rptr.2d 369 (1996), for example, the defendant's hindering conviction was upheld because, during an undercover drug buy, the defendant revealed to a potential buyer that the seller was a police officer, and the suspect then fled.

Relying on all of these cases, we are persuaded that appellant's public disclosure of DiPino's actual occupation as a narcotics officer did not constitute an act of hindering. It is one thing to criminalize the conduct of a citizen who knowingly interferes with an officer engaged in a covert operation, such as a controlled drug transaction or surveillance of a robbery

suspect, or with an officer who is in the process of chasing a suspect or effecting an arrest. It is quite another to criminalize a citizen's disclosure of the officer's identity, without more. Therefore, we conclude that a reasonable person in the position of Officer DiPino would not have believed that Davis committed an act of hindering when he revealed to King, or anyone else within earshot, that DiPino was an undercover narcotics officer. Accordingly, the trial court erred in finding probable cause for hindering.

### III.

Appellant contends that, separate and apart from the probable cause issue, his arrest ran afoul of his constitutional right to free expression, guaranteed by the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights. He argues that he was prosecuted because of the content of his speech, and not for any actual interference on his part with the officer's performance of duty. Counsel for appellant encapsulated the issue at trial, stating: "It's not a crime . . . to say the truth. It's not a crime to say, 'That person's a lawyer', 'That person's a judge', 'That person is a police officer.'"

DiPino and Ocean City counter that speech alone can constitute the crime of hindering. Appellees also argue that the arrest was a valid exercise of the State's power, because appellant's behavior created a clear and present danger to the police officers. They assert that appellant's "words were . . . tripwires to expose DiPino's presence to a dangerous criminal element." Thus, they contend that "Appellant cannot cloak himself in the protections of the First Amendment while impairing the safety of peace officers. DiPino reasonably believed Appellant had 'blown her cover' and placed her in extreme danger. . . . Mere truthfulness does not entitle appellant's words to . . . protection."

Preliminarily, we note that even if appellant's arrest were supported by probable cause, this would not foreclose a constitutional claim based on a free speech violation. We find

support for this view in *Ashton*, 339 Md. 70, 660 A.2d 447. There, the plaintiffs had been detained for suspected violations of the City of Frederick's juvenile curfew ordinance, and they later challenged the constitutionality of the ordinance. The Court of Appeals noted that both the trial court and this Court erroneously limited their analyses to claims based on the Fourth Amendment and Article 26, "apparently assuming that the unconstitutionality of an arrest is governed solely by these provisions." *Ashton*, 339 Md. at 98, 660 A.2d 447. The Court said, however, that even if a "police officer [has] probable cause to believe that a person has violated a penal statute, and thus makes an arrest, if the statute itself is unconstitutional *or has been unconstitutionally applied*, the arrestee's constitutional rights have been violated." *Id.* (emphasis added). The Court added that an arrest is unconstitutional if it is "inconsistent" with the arrestee's rights to due process and equal protection. *Id.* The *Ashton* Court explained:

> [N]either the federal nor the state constitution permits a governmental body to arrest and detain its citizens pursuant to unconstitutional legislative enactments.... Even if we assume, *arguendo*, that there was probable cause for the plaintiffs' arrest [under the curfew ordinance], the plaintiffs were nonetheless detained on an unconstitutional basis.... [A] vague penal statute violates citizens' rights to due process of law, rights protected by the Fourteenth Amendment and by Article 24 of the Maryland Declaration of Rights.

*Id.* at 97, 660 A.2d 447 (internal citations omitted). Accordingly, even if appellant's arrest for hindering were supported by probable cause, it was incumbent upon the trial court to consider appellant's free speech claim.

 ■ It is well settled that the State bears a heavy burden when it criminalizes speech. The State may not punish a citizen for his speech unless the words fall outside the broad protections of the First Amendment. Nor may it "broadly criminaliz[e] speech [merely because it is] directed to an officer...." *City of Houston v. Hill*, 482 U.S. 451, 462 n. 11, 107 S.Ct. 2502, 2510 n. 11, 96 L.Ed.2d 398 (1987). Recently,

the Fourth Circuit eloquently explained the importance of the First Amendment to our constitutional framework:

> [I]t is evident ... from our own history ... [the] right to advocate lawlessness is, almost paradoxically, one of the ultimate safeguards of liberty. Even in a society of laws, one of the most indispensable freedoms is that to express in the most impassioned terms the most passionate disagreement with the laws themselves, the institutions of, and created by, law, and the individual officials with whom the laws and institutions are entrusted. Without the freedom to criticize that which constrains, there is no freedom at all.

*Rice v. Paladin Enters., Inc.* 128 F.3d 233, 243 (4th Cir. 1997).[10]

In evaluating appellant's claim that his constitutional rights to free speech were violated, we are guided by numerous Supreme Court decisions involving First Amendment challenges to state action in both the civil and criminal arenas. *See, e.g., Hill,* 482 U.S. at 451, 107 S.Ct. at 2504; *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

*Hill* bears directly on the issues before us, although it involved a local ordinance rather than a common law offense. When Hill observed two police officers confront his friend,

---

**10.** The Fourth Circuit said in *Rice,* however, that

> The First Amendment is quite irrelevant if the intent of the actor and the objective meaning of the words used are so close in time and purpose to a substantive evil as to become part of the ultimate crime itself.... [W]here speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone.

*Rice,* 128 F.3d at 245 (quoting *United States v. Freeman,* 761 F.2d 549, 552 (9th Cir.1985), *cert. denied,* 476 U.S. 1120, 106 S.Ct. 1982, 90 L.Ed.2d 664 (1986) (citations omitted)). Thus, the Fourth Circuit concluded that the plaintiffs stated a civil claim for aiding and abetting a triple murder against the publisher of a murder instruction manual, who intended to provide help to prospective murderers. The Court reasoned that "the First Amendment does not pose a bar to a finding that Paladin is civilly liable as an aider and abetter of [a] triple contract murder." *Id.* at 243.

who had intentionally stopped traffic on a busy street in order to allow a car to enter traffic, *id.* at 453, 107 S.Ct. at 2505, Hill shouted, " 'Why don't you pick on somebody your own size?' " *Id.* at 454, 107 S.Ct. at 2505. Officer Kelley responded, " '[A]re you interrupting me in my official capacity as a Houston police officer?' " *Id.* Hill replied, " 'Yes, why don't you pick on somebody my size?' " *Id.* At the time, a Houston ordinance provided:

> It shall be unlawful for any person to assault, strike[11] or in any manner oppose, molest, abuse or interrupt any police-man in the execution of his duty, or any person summoned to aid in making an arrest.

*Id.* at 455, 107 S.Ct. at 2506. Consequently, Hill was arrested for " 'wilfully or intentionally interrupt[ing] a city policeman ... by verbal challenge during an investigation.' " *Id.* at 454, 107 S.Ct. at 2505 (alterations in original).

At his criminal trial, Hill was acquitted. *Id.* at 454, 107 S.Ct. at 2505. Later, he sued the City of Houston, seeking injunctive and declaratory relief and damages under 42 U.S.C. §§ 1983 and 1988. In finding the ordinance unconstitutionally overbroad, the Supreme Court recognized the danger of a law that gives police officers "unfettered discretion to arrest indi-viduals for words or conduct that annoy or offend them." *Id.* at 465, 107 S.Ct. at 2511. The Court also observed that "the First Amendment protects a significant amount of verbal criticism directed at police officers .... 'unless shown likely to produce a clear and present danger of a serious substantive evil....' " *Id.* at 461, 107 S.Ct. at 2509 (quoting *Terminiello,* 337 U.S. at 4, 69 S.Ct. at 896). Characterizing the City of Houston's ordinance as "sweeping," *id.,* concerned about the potential for abuse, *id.* at 466, 107 S.Ct. at 2512, and noting that the ordinance "was not limited to fighting words nor even to obscene or opprobrious language," *id.* at 462, 107 S.Ct. at 2510, the Court remarked:

---

11. The City of Houston conceded that the portion of the ordinance proscribing physical attacks on police officers was pre-empted by the Texas Penal Code. *Hill,* 482 U.S. at 460, 107 S.Ct. at 2508–09.

The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.

\* \* \* \*

Houston's ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals—those chosen by the police in their unguided discretion—are arrested.

*Id.* at 462–63, 466–67, 107 S.Ct. at 2510, 2512 (citations and footnote omitted).

The *Hill* Court relied on *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), which struck down an ordinance that made it a crime " 'to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty.' " *Hill,* 482 U.S. at 461, 107 S.Ct. at 2509 (quoting *Lewis,* 415 U.S. at 132, 94 S.Ct. at 972 (citations omitted)). Justice Powell's concurring opinion in *Lewis* is particularly noteworthy here. He said:

This ordinance, as construed by the Louisiana Supreme Court, confers on police a virtually unrestrained power to arrest and charge persons with a violation. Many arrests are made in 'one-on-one' situations where the only witnesses are the arresting officer and the person charged. All that is required for conviction is that the court accept the testimony of the officer that obscene or opprobrious language had been used toward him while in the performance of his duties. . . .

The present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person. The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.

*Lewis,* 415 U.S. at 135–36, 94 S.Ct. at 973–74 (Powell, J., concurring in the result).

*Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), also provides guidance to us. There, a challenge was mounted under § 1983 to a high school's policy prohibiting students from wearing black armbands to protest the Vietnam War. Although the lower federal courts upheld the ban on the ground that it was a reasonable regulation to avoid disturbances in schools, *id.* at 504–05, 89 S.Ct. at 735–36, the Supreme Court voided it and remanded for further proceedings regarding the remedy. The Court stated:

> Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots. *The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances.* But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom.

*Id.* at 513, 89 S.Ct. at 740 (emphasis added).

Some of the "carefully restricted circumstances" in which the Supreme Court has recognized the State's interest in proscribing speech include fighting words, *see, e.g., Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Downs v. State,* 278 Md. 610, 366 A.2d 41 (1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977); obscene speech, *see, e.g., Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); and speech that creates a clear and present danger of imminent lawless action.

*See Brandenburg v. Ohio,* 395 U.S. 444, 448, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969) (per curiam).

Appellees rely upon an oft-quoted passage from *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919),[12] to support their argument that appellant was validly arrested because his words created a clear and present danger:

> The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. . . . The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.

*Id.* at 52, 39 S.Ct. at 249 (citations omitted).

In the seminal case of *Brandenburg,* the Supreme Court articulated the modern view of the clear and present danger doctrine. It "held that abstract advocacy of lawlessness is protected speech under the First Amendment." *Rice,* 128 F.3d at 243 (explaining *Brandenburg*).

*Brandenburg* involved a Ku Klux Klan rally on a farm outside of Cincinnati. A local television reporter who had been invited to witness the rally filmed the event. Later, the reporter broadcast portions of the footage containing incendiary racist rhetoric in which the speaker said that "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [sic] taken." *Brandenburg,* 395 U.S. at 446, 89 S.Ct. at 1829. Subsequently, Brandenburg, the Klan's leader, was convicted under a statute making it illegal to advocate " 'the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial

---

12. Interestingly, Schenck was not arrested for falsely yelling fire, but rather for mailing leaflets to men who had passed their draft board examinations, exhorting them to "assert" their "rights," and equating conscription with involuntary servitude. 249 U.S. at 51, 39 S.Ct. at 248–49. The *Schenck* Court upheld the petitioner's conviction.

or political reform,'" or to assemble "'with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism.'" *Id.* at 444–45, 89 S.Ct. at 1828. The Supreme Court overturned the conviction because the record did not support an inference that the racist speech posed an immediate threat of physical harm. The Court reasoned that

the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

*Id.* at 447, 89 S.Ct. at 1829; *see also Texas v. Johnson,* 491 U.S. 397, 409, 109 S.Ct. 2533, 2542–43, 105 L.Ed.2d 342 (1989) (holding that burning the American flag was protected expressive conduct and stating "we have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the *actual circumstances surrounding such expression* . . ." (emphasis added)).

The case *sub judice* is altogether unlike *Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), in which a former employee of the Central Intelligence Agency ("CIA"), living overseas, deliberately attempted to damage the CIA. In an effort to undermine the CIA's clandestine activities, the defendant sought to disclose the identities of the agency's undercover intelligence agents, which also violated his contract with the Government. Because of the potential damage to national security, the Secretary of State revoked Agee's passport. Agee then filed suit in federal court for declaratory and injunctive relief alleging, *inter alia,* that the passport revocation violated his First Amendment right to criticize the Government. The Supreme Court disagreed, stating that Agee's claim had "no foundation." *Id.* at 308, 101 S.Ct. at 2782–83. The Court said that because Agee's

disclosures ... have the declared purpose of obstructing intelligence operations .... [t]hey are clearly not protected by the Constitution. The mere fact that Agee is also en-

gaged in criticism of the Government does not render his conduct beyond the reach of the law.

To the extent the revocation of his passport operates to inhibit Agee, 'it is an inhibition of action,' rather than of speech. Agee is as free to criticize the United States Government as he was when he held a passport. . . .

*Id.* at 308–09, 101 S.Ct. at 2783 (citations omitted) (quoting *Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965)).

 Applying the principles gleaned from the above-cited cases, we are convinced that appellees' reliance on the "clear and present danger" analysis is misplaced; the clear and present danger doctrine did not justify appellant's arrest. Davis did not make a false statement. Nor did he incite lawless action. To be sure, this case did not involve national security that was jeopardized by a former governmental employee who had knowledge of sensitive security information.

Moreover, the evidence did not show that anyone besides King and the officers actually heard appellant's comment. Indeed, the police officers merely speculated that people across the street may have heard Davis's remarks; DiPino claimed that she saw "dirty looks" from others on the Street, but conceded that her two targets had already left the area, and things in the area were beginning to "wind down." Additionally, no evidence was presented to show that appellant actually placed the officers in any danger. To the contrary, almost two months passed, uneventfully, between the time of the occurrence and appellant's arrest. During that period, there was no suggestion of harm or threats of harm to DiPino that would have justified her continued belief that Davis put her in "extreme danger." While DiPino may have been exposed to a greater risk of danger than she would have been absent appellant's remarks, this does not amount to the "clear and present danger of imminent lawless action" that words must cause in order for one's First Amendment rights to succumb to valid state action.

Appellees also assert a "clear and present danger" to state interests on the ground that DiPino's undercover investigation could have been compromised. We have not uncovered any authority from which an unqualified right to protect an investigation flows. *See CLR*, 700 P.2d at 1197 (declining to recognize the possible threat to future undercover work as a sufficient basis to support a hindering conviction).

Few would deny that undercover police work is a valuable and vital tool in the modern law enforcement arsenal, and that an officer may well be exposed to additional risks and danger from undercover police work. Certainly, when an officer's cover is "blown," his or her effectiveness is undoubtedly compromised. That, of course, explains why law enforcement agencies customarily endeavor diligently to secure their clandestine operations, the identities of confidential informants, and the identities of law enforcement personnel involved in covert investigations. It does not follow, however, that an undercover officer has a superior entitlement to maintain his or her anonymity at the expense of a citizen's constitutional right to free speech.

We also cannot ignore that appellant's remarks were uttered on a public street. Historically, the public street has been viewed as the "quintessential" public forum which has " 'immemorially been held in trust for the use of the public ... used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)(Roberts, J., concurring)). Public discourse, even of the sort involved here, facilitates one of this country's guiding principles: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion...." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

This case also illustrates the arbitrariness and unfettered police discretion that the Supreme Court was concerned about in *Hill*. That the officer was arbitrary in pursuing Davis is evident from DiPino's own testimony. On cross-examination, she testified that her father worked with Davis's girlfriend during the relevant period. After Davis's arrest, DiPino learned from her father that it was Davis's girlfriend who had revealed DiPino's true identity to Davis. Yet DiPino never sought charges against the girlfriend for hindering. Nor did the officer file charges against appellant when he revealed to DiPino, a year earlier, that Sergeant Holtzman was actually a police officer. DiPino thus seems to have acted "selectively on the basis of the content of the speech. Such discretion is particularly repugnant given '[t]he eternal temptation . . . to arrest the speaker rather than to correct the conditions about which he complains.'" *Hill*, 482 U.S. at 465 n. 15, 107 S.Ct. at 2511 n. 15 (alterations in original) (quoting *Younger v. Harris*, 401 U.S. 37, 65, 91 S.Ct. 760, 764, 27 L.Ed.2d 669 (1971) (Douglas, J., dissenting)). As the Supreme Court said in *Hill*, fundamental constitutional values are impermissibly compromised when a criminal prohibition can potentially be "violated scores of times daily, yet only some individuals—those chosen by the police in their unguided discretion—are arrested." 482 U.S. at 466–67, 107 S.Ct. at 2512 (citation omitted).

Appellant's comment understandably annoyed or angered DiPino. But we cannot countenance an arrest based on "conduct that annoy[ed]" a police officer. *Id.* at 465, 107 S.Ct. at 2511. Nor can we sanction an arrest because of an officer's "personal predilections . . . [thereby] entrusting lawmaking 'to the moment-to-moment judgment of the policeman on his beat.'" *Smith v. Goguen*, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974) (citations omitted) (quoting *Gregory v. Chicago*, 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969) (Black, J., concurring)).

We are also troubled because, given that there was nothing about the officers' appearance or conduct that revealed that they were engaged in the performance of their

duties, Davis lacked fair notice that mere spoken words, which did not disturb the peace, could nonetheless constitute the crime of obstructing the officer's performance of duty. *See Cantwell*, 310 U.S. at 311, 60 S.Ct. at 906. "It is an elemental requirement of our constitutional jurisprudence that laws be reasonably intelligible, providing citizens with fair notice as to what conduct is legal and what conduct is illegal." Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 6:13 (1996) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (holding unconstitutional vagrancy statutes that were purposely designed to grant police broad discretion)).

We reiterate that we recognize the need to strike a balance between the public interest in undercover police work, which advances the State's important goals of preventing and detecting crime and capturing criminals, and the equally important right of free expression. There is no balance here, however. Based on the facts of this case, we conclude that appellant was arrested in violation of his constitutional rights to free speech.

## IV.

As we mentioned earlier, the trial court treated the issue of probable cause as dispositive. We have concluded, however, that Davis's arrest was not founded upon probable cause, and that his arrest contravened his rights to free expression. Therefore, we shall vacate the judgment against Davis and in favor of DiPino with regard to the federal and State constitutional claims, and remand to the trial court for further proceedings, including consideration of the immunity defenses. On remand, the circuit court must consider the immunity defenses and determine whether DiPino acted with malice. *See Cox v. Prince George's County*, 296 Md. 162, 169, 460 A.2d 1038 (1983) ("[A] police officer does not enjoy . . . immunity if he commits an intentional tort or acts with malice."). If damages are appropriate, the court must also take evidence as to damages and determine the amount, if any, to which appellant is entitled. For the benefit of the court on remand, we shall briefly address the immunity defenses.

The body of federal and State immunity law is "complex and sometimes confusing." *Ritchie,* 324 Md. at 354, 597 A.2d 432. *See generally Ashton,* 339 Md. at 101–18, 660 A.2d 447; *Clea v. Mayor of Baltimore,* 312 Md. 662, 679–85, 541 A.2d 1303 (1988); *Town of Port Deposit v. Petetit,* 113 Md.App. 401, 414–23, 688 A.2d 54, *cert. denied,* 346 Md. 27, 694 A.2d 950 (1997); *Thomas v. City of Annapolis,* 113 Md.App. 440, 688 A.2d 448 (1997); *Simms v. Constantine,* 113 Md.App. 291, 688 A.2d 1 (1997); *Williams v. Prince George's County,* 112 Md.App. 526, 685 A.2d 884 (1996). Some immunities derive from common law and others are statutory.

Maryland does not provide common law immunity to a public official sued for violating an individual's State constitutional rights. *Ashton,* 339 Md. at 102, 660 A.2d 447; *Parker v. State,* 337 Md. 271, 285, 653 A.2d 436 (1995); *Clea,* 312 Md. at 679, 541 A.2d 1303; *Williams,* 112 Md.App. at 546, 685 A.2d 884. Under Maryland law, "a public official who violates a plaintiff's rights under the Maryland Constitution is entitled to no immunity." *Clea,* 312 Md. at 680, 541 A.2d 1303. A plaintiff is entitled to compensatory damages for such a violation, and the Court made clear in *Clea* that "the presence or absence of malice is pertinent only to the question of punitive damages." *Id.* at 684, 541 A.2d 1303.

Although appellant sought punitive damages in his amended complaint, the court did not address the issue of malice. We note, also, that a statutory immunity defense may apply here, so long as DiPino did not act with malice. *See* Md.Code (1974, 1995 Repl. Vol.), § 5–321(b)(1) of the Courts and Judicial Proceedings Article ("C.J.").

In a § 1983 action, qualified immunity, sometimes called good-faith immunity, is available as an affirmative defense. It shields a police officer from damages if the challenged "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Elder v. Holloway,* 510 U.S. 510, 512, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344

(1994); *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984); *Butz v. Economou*, 438 U.S. 478, 498, 98 S.Ct. 2894, 2906–07, 57 L.Ed.2d 895 (1978); *Ritchie*, 324 Md. at 360–61, 597 A.2d 432; *Williams*, 112 Md.App. at 543, 685 A.2d 884. Qualified immunity is also available so long as it was "objectively reasonable for [the officers] to believe that their acts did not violate those rights." *Golino*, 950 F.2d at 870. Qualified immunity may be defeated, however, when the plaintiff shows that the rights under consideration were "clearly established" at the time of the officer's conduct. *Elder*, 510 U.S. at 514, 114 S.Ct. at 1022. In this regard, we note that *Cover* was decided in 1983, years before the underlying incident. Surely, the elements of the offense could have been ascertained in the weeks between the incident and the arrest.

The availability of immunity may depend on whether the action is brought against an employee or a public official, and whether the public official is acting in an official or individual capacity. *Ritchie*, 324 Md. at 354, 597 A.2d 432. Moreover, under § 1983, whether a particular defendant is a "person" may be equally "complex." *Id.* For purposes of a § 1983 action to recover money damages, a State official acting in an official capacity is not a "person." *Id.* at 355, 597 A.2d 432. Yet a State officer or employee may be subject to liability under § 1983 when sued in an individual capacity. *Id.* The Supreme Court has also determined that a local government employee or official is a "person" within the meaning of the statute, and can be sued for money damages, regardless of whether the local governmental official acted in an individual or official capacity. Moreover, a municipality is considered a person for § 1983 purposes "when governmental law, policy or custom contributed to a violation of federal constitutional or statutory rights." *Id.* at 356, 597 A.2d 432 (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978)); *see also Howlett v. Rose*, 496 U.S. 356, 376, 110 S.Ct. 2430, 2442–43, 110 L.Ed.2d 332 (1990); *Ashton*, 339 Md. at 109, 660 A.2d 447. Nevertheless, "[g]overnmental entities are not liable under § 1983 by

mere respondeat superior." *Kopf v. Skyrm*, 993 F.2d 374, 381 (4th Cir.1993).

■ Although we have concluded that Davis's arrest was not supported by probable cause, the question arises as to whether DiPino is nonetheless insulated from responsibility for the illegal arrest, merely because she presented a truthful Application for Statement of Charges to Commissioner Turner. It was Turner, after all, who was required to review the legal sufficiency of the allegations, in order to determine whether probable cause existed for the issuance of the Statement of Charges and the arrest warrant. At least in the context of a § 1983 action, *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), governs the resolution of this issue. Contrary to the dissent's suggestion, *Malley* establishes that mere presentation to a judicial officer of an Application for Statement of Charges does not automatically protect a police officer from § 1983 liability, even when the Application does not contain any falsehoods.

In *Malley*, a state trooper presented felony complaints, arrest warrants, and supporting affidavits to a state judge, who signed the warrants. After the grand jury failed to return indictments, the charges were dropped. Thereafter, the arrestees brought suit in federal court under 42 U.S.C. § 1983, alleging that the officer violated their rights under the Fourth and Fourteenth Amendments when he applied for the arrest warrants. At trial, the court granted a directed verdict, reasoning that "the act of the judge in issuing the arrest warrants . . . broke the causal chain between petitioner's filing of a complaint and respondents' arrest." *Id.* at 339, 106 S.Ct. at 1095. The trial judge also concluded that the officer was entitled to immunity under an "objective reasonableness" standard, because the officer believed the facts in his affidavits were true and he submitted them to a neutral judicial officer. *Id.*

The Supreme Court considered "the degree of immunity accorded a defendant police officer in a damages action under 42 U.S.C. § 1983 when . . . the officer caused the plaintiffs to

be unconstitutionally arrested by presenting a judge with a complaint and a supporting affidavit which failed to establish probable cause." *Id.* at 335, 106 S.Ct. at 1093. At the outset, the Supreme Court rejected the officer's contention that, under common law principles, he was entitled to absolute immunity. It noted that at common law a citizen did not enjoy such a broad privilege. *Id.* at 340, 106 S.Ct. at 1095–96. Moreover, the Court was unpersuaded by the officer's argument that policy considerations warranted his entitlement to absolute immunity. To the contrary, the Court could not justify exempting from "any scrutiny whatsoever" an officer's conduct in seeking an arrest or search warrant. *Id.* at 344, 106 S.Ct. at 1097. The Court also. rejected the trial judge's causation analysis because it was at odds with § 1983 law. It recognized, instead, a "causal link between the submission of a complaint and an ensuing warrant...." *Id.* at 344–45 n. 7, 106 S.Ct. at 1098 n. 7.

The Supreme Court concluded that a qualified immunity defense would adequately protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341, 106 S.Ct. at 1096. Thus, when an officer's request for a warrant results in an unconstitutional arrest and a subsequent damages action instituted under § 1983, the Court said that the objective reasonableness standard enunciated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is applicable. That standard "gives ample room for mistaken judgments." *Malley,* 475 U.S. at 343, 106 S.Ct. at 1097. On the other hand, if "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable," *id.* at 344–45, 106 S.Ct. at 1098, then no immunity is available.

What the Court said in *Malley* resonates here: "[Police officers] will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 S.Ct. at 1096. The

Court also said: "A damages remedy for an arrest following an objectively unreasonable request for a warrant imposes a cost directly on the officer responsible for the unreasonable request...." *Id.* at 344, 106 S.Ct. at 1097–98. Reasoning that "the judicial process will on the whole benefit from a rule of qualified rather than absolute immunity," *id.* at 343, 106 S.Ct. at 1097, the Court explained:

> True, an officer who knows that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause. But such reflection is desirable, because it reduces the likelihood that the officer's request for a warrant will be premature. Premature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests, which may injure the innocent or ... benefit the guilty.

*Id.* at 343–44, 106 S.Ct. at 1097.

Perhaps most significant to this case, the Court expressly disagreed with the officer's claim that he was insulated from liability because he was entitled to rely on the judgment of a judicial officer who reviewed the warrant application and issued the arrest warrant after finding probable cause. *Id.* at 345, 106 S.Ct. at 1098. Indeed, the Court squarely rejected the contention that so long as the officer believes the facts alleged in the affidavit are true, "the act of applying for a warrant is *per se* objectively reasonable," *id.* at 345, 106 S.Ct. at 1098, thereby shielding the officer from liability. The Court characterized such an argument as an effort to "excuse [the officer's] own default by pointing to the greater incompetence of the magistrate." *Id.* at 346 n. 9, 106 S.Ct. at 1098 n. 9. Recognizing that the important "question ... is whether a reasonably well–trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant," *id.* at 345, 106 S.Ct. at 1098, the Court concluded that a police officer must be responsible for his own actions. The *Malley* Court explained:

It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

*Id.* at 345–46, 106 S.Ct. at 1098.

As we read *Malley*, it is not enough that the contents of a warrant application are true. The application must set forth facts constituting probable cause for the crime in issue.[13] Moreover, *Malley* makes clear that, at least under federal law, an officer is not automatically protected from liability merely because a judicial officer ultimately determines to issue the arrest warrant. We do not know of any reason why the rationale of *Malley* would not apply in the State context. Indeed, we have not found any authority in Maryland to support the proposition that an officer who presents a truthful but deficient Application for Statement of Charges to a court commissioner is nonetheless protected from liability for an illegal arrest.

## V.

■■■ As to Ocean City, we are satisfied that an affirmance with respect to the State and federal constitutional claims is appropriate, even though Maryland law "provides no immunity for municipalities and other local government entities from suits based upon violations of state constitutional rights." *Ashton*, 339 Md. at 101, 660 A.2d 447; *see also Board of Educ. v. Mayor of Riverdale*, 320 Md. 384, 389, 578 A.2d 207 (1990). We explain.

---

13. In our view, the dissent mistakenly considers the truthfulness of the officer's affidavit as dispositive. Even if every word is unassailably true, if the assertions do not amount to probable cause, mere truthfulness is not enough.

■■ At the close of appellant's case, Davis's counsel said: "As to the 1983 claim, Your Honor, I will concede there has been no testimony regarding the liability of the municipality." He maintained, however, that Ocean City had no immunity with respect to the State constitutional tort claims. Yet in his brief, appellant presents, at best, only a glancing reference to Ocean City's liability for any constitutional violations; virtually the entire discussion focuses on Officer DiPino. At the conclusion of the relevant discussion, appellant merely states: "If Sergeant DiPino is liable for a violation of Appellant's State Constitutional Rights ... the City is liable, pursuant to *respondeat superior*." [14] Moreover, appellant makes no mention whatsoever of Ocean City's potential liability for the violation of his right to free speech, under either the federal Constitution or the Maryland Declaration of Rights. Consequently, we conclude that appellant has not adequately pursued these claims on appeal, and we will not consider them.

■■ It is a settled principle that we will not address arguments that an appellant has not raised in an opening brief submitted to this Court. *See Health Servs. Cost Review Comm'n v. Lutheran Hosp.*, 298 Md. 651, 664, 472 A.2d 55 (1984) ("[A] question not presented or argued in an appellant's brief is waived or abandoned and is, therefore, not properly preserved for review."); *see also Harrison v. Harrison*, 109 Md.App. 652, 679–80, 675 A.2d 1003 (stating that an argument concerning an underlying divorce order that was not previously challenged on appeal could not be raised in a later appeal concerning collateral matters), *cert. denied*, 343 Md. 564, 683 A.2d 177 (1996); *Monumental Life Ins. Co. v. United States*

---

**14.** As we noted earlier, in *Monell*, 436 U.S. at 690–95, 98 S.Ct. at 2035–38, the Supreme Court determined that a municipality can be held civilly liable under 42 U.S.C. § 1983, but not based on the tort theory of *respondeat superior*. Instead, a municipality can be held legally responsible under § 1983 only for its actions executed through the municipality's law, policy, or custom. *See also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986) (clarifying *Monell* and stating that, "under appropriate circumstances," municipal liability may be imposed for a single action by municipal policymakers).

*Fidelity & Guar. Co.,* 94 Md.App. 505, 544, 617 A.2d 1163, *cert. denied,* 330 Md. 319, 624 A.2d 491 (1993).

Moreover, the failure to discuss a contention asserted in the brief violates Maryland Rule 8–504(a)(5), and thus constitutes a waiver of the claim. *See also Conaway v. State,* 108 Md.App. 475, 484–85, 672 A.2d 162, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996); *Holiday Universal Club v. Montgomery County,* 67 Md.App. 568, 570 n. 1, 508 A.2d 991, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986), *appeal dismissed,* 479 U.S. 1049, 107 S.Ct. 920, 93 L.Ed.2d 973 (1987). What we said in *GAI Audio of New York v. Columbia Broadcasting System, Inc.,* 27 Md.App. 172, 340 A.2d 736 (1975), is worth repeating here:

> This rule [the predecessor to Rule 8–504] has been clearly violated. We do not consider any of the points above listed because there is no argument in support of them and they are, in effect, waived. As Judge Davidson said very recently for this Court in *Kimbrough v. Giant Foods [Food], Inc.,* 26 Md.App. 640, 339 A.2d 688 [ (1975) ]:
>
>> "Maryland Rule 1031 c 4 provides that the brief of an appellant to this Court shall contain argument in support of his position. The Court of Appeals has held that issues, even of constitutional dimension, can be waived for failure to comply with the procedural requirements to preserve the right to appellate review. Under the present circumstances the constitutional issue is not properly before this Court and will not be considered."

*GAI Audio,* 27 Md.App. at 183, 340 A.2d 736.

We are also guided by *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979). There, we observed that the commands of the predecessor to Rule 8–504 were

> mandatory and, therefore, it is necessary for the appellant to present and argue all points of appeal in his initial brief. As we have indicated in the past, our function is not to scour the record for error once a party notes an appeal and files a brief.

In prior cases where a party initially raised an issue but then failed to provide supporting argument, this Court has declined to consider the merits of the question so presented but not argued.

*Id.* at 457–58, 406 A.2d 928 (citations omitted).

Accordingly, because appellant has failed adequately to present us with the question of whether the circuit court erroneously entered judgment in favor of Ocean City on the state and federal constitutional claims, the issue is not before us. Therefore, we will affirm the judgments in favor of Ocean City with respect to those claims.

## VI.

Appellant sought to recover for the intentional torts of false arrest, false imprisonment, malicious prosecution, and abuse of process. The circuit court granted judgment in favor of DiPino on all counts, without any discussion of these claims. We shall briefly examine the State tort claims in light of our holding that DiPino lacked probable cause to arrest Davis.

The elements of false arrest are (1) the deprivation of liberty of another (2) without consent, and (3) without legal justification. *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 1000 (1997); *Ashton*, 339 Md. at 119, 660 A.2d 447. The tort "protects the personal interest in freedom from restraint of movement." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 11, at 47 (5th ed.1984). The elements of false imprisonment are the same as the elements for false arrest. *See Montgomery Ward v. Wilson*, 339 Md. 701, 721, 664 A.2d 916 (1995); *Allen v. Bethlehem Steel Corp.*, 76 Md.App. 642, 649, 547 A.2d 1105, *cert. denied sub nom. Green and Vernon Green Assocs. v. Allen*, 314 Md. 458, 550 A.2d 1168 (1988); *see also* Keeton et al., *supra*, § 11, at 47 ("[T]he tort of false imprisonment [is] sometimes called false arrest...."). "[W]here the basis of a false imprisonment action is an arrest by a police officer, the liability of the police officer for false imprisonment will ordinarily depend upon whether or not the officer acted within his legal authority to arrest."

*Montgomery Ward,* 339 Md. at 721, 664 A.2d 916. In addition, an arrest is legally justified if made pursuant to a warrant that appears on its face to be legal. *Ashton,* 339 Md. at 120, 660 A.2d 447.

██ DiPino did not carry out the arrest warrant. At trial, Davis testified that a male police officer arrested him on July 6, 1991, pursuant to a warrant. There is no claim that the warrant was, on its face, illegal. The arrest, and Davis's resulting two-day incarceration, are the only deprivations of liberty about which Davis complained. While DiPino may have set in motion the process by which Davis was deprived of his liberty, the common law tort of false arrest contemplates that the defendant, through threats or actions, must create a "present restraint of liberty." Keeton et al., *supra,* § 11, at 51. Although Davis was deprived of his liberty, he was not physically arrested by DiPino. *See id.* at 53–54. Therefore, the circuit court properly entered judgment in favor of DiPino on that claim.

██ To establish a claim for abuse of process, the plaintiff must prove (1) wilful use of process for an illegal purpose, (2) with an underlying ulterior motive, and (3) resulting damages. *Humphrey v. Herridge,* 103 Md.App. 238, 653 A.2d 491 (1995); *see also Allen,* 76 Md.App. at 650, 547 A.2d 1105. The tort occurs only when a person uses criminal or civil process for an illegal purpose *after* process has issued. *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 511, 471 A.2d 297 (1984); *Allen,* 76 Md.App. at 650, 547 A.2d 1105. Essentially, appellant claimed that DiPino was liable because she sought a warrant for Davis's arrest. Davis submitted no evidence that DiPino made illegal use of the warrant, after it was issued, for an ulterior motive. Therefore, we are satisfied that the trial court correctly entered judgment in favor of DiPino on that count.

██ In a claim for malicious prosecution, the plaintiff must show (1) a prosecution initiated against the plaintiff without probable cause, (2) with malice, or with a motive other than to bring the offender to justice; and (3) termination of

the prosecution in favor of the plaintiff. *Montgomery Ward,* 339 Md. at 714, 664 A.2d 916; *Allen,* 76 Md.App. at 651, 547 A.2d 1105. In this context, malice means the performance of an intentional act that has been performed "without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Leese v. Baltimore County,* 64 Md.App. 442, 480, 497 A.2d 159 (internal quotations omitted), *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985); *see Williams,* 112 Md.App. at 550, 685 A.2d 884. In a cause of action for malicious prosecution, the effect of a *nolle prosequi* on the essential element of termination in favor of the plaintiff "is far from crystalline." *Allen,* 76 Md.App. at 651, 547 A.2d 1105. Ordinarily, "[w]henever a *nolle pros* is entered by the State, the court must look at the circumstances surrounding the State's decision so as to determine whether there was an absence of probable cause." *Id.*

When the circuit court determined that there was probable cause, it entered judgment in favor of the defense, without considering whether DiPino acted with malice. As we have concluded that the arrest was not based on probable cause, the question of malice is critical. In the absence of malice, "neither police officers nor their supervisors may be liable for discretionary actions taken in the performance of their duties." *Williams,* 112 Md.App. at 551, 685 A.2d 884. Therefore, we must remand the matter to the circuit court for further proceedings with respect to the claim against DiPino for malicious prosecution.

Appellant also assigns error to the circuit court's decision granting judgment in favor of Ocean City with respect to the State intentional tort claims. Based upon the foregoing discussion, we perceive no error as to the false arrest claim, which failed for lack of evidence that DiPino deprived Davis of his liberty. Nor do we find error with regard to the abuse of process claim, which failed for lack of evidence that DiPino sought to make improper use of process after it had issued. If the servant has not committed a tort,

then there is no basis on which to hold the master vicariously liable. Accordingly, we conclude that judgment was also properly entered in favor of Ocean City on those claims.

The more difficult issue concerns the claim against Ocean City for malicious prosecution. Under certain circumstances, a municipality may be liable for the torts of its employees that occur within the scope of employment, based on the doctrine of *respondeat superior*. *Port Deposit,* 113 Md.App. at 418–23, 688 A.2d 54. The Local Government Tort Claims Act, C.J. §§ 5–401 to 5–404 (now at C.J. §§ 5–301 to 5–304),[15] makes local governments liable for damages awarded against their employees for tortious acts committed within the scope of employment, but without malice. *Ashton,* 339 Md. at 107, 660 A.2d 447. C.J. § 5–403(e) (now C.J. § 5–303(e)) also provides a local government with the benefit of its employee's defenses and immunities. *Williams,* 112 Md.App. at 551–52, 685 A.2d 884. Based on our reasons warranting remand of this claim as to Officer DiPino, however, dismissal of the malicious prosecution claim against Ocean City was premature.

## VII.

Appellant argues that the circuit court erroneously granted Turner's motion to dismiss. Essentially, appellant claims that Commissioner Turner ignored the requirements of Maryland Rule 4–212(d)(1) and improperly issued a warrant rather than a summons. As a consequence, appellant contends that he was deprived of his Fourth Amendment right to be free from unreasonable seizures, his Fifth Amendment right to due process of law, and his Fourteenth Amendment right to equal protection of the laws, as well as his rights under Articles 24 and 26 of the Maryland Declaration of Rights. As a resident of Ocean City, appellant also asserts that he is "susceptible in the future to being arrested when, by law, a CRIMINAL SUMMONS should be issued rather than a WARRANT."

---

15. These provisions were transferred by 1997 Md. Laws, Chap. 14.

Appellant thus sought declaratory and injunctive relief, attorney's fees, and costs.

Appellant has not included in the record extract the transcript of the September 25, 1995 hearing at which the judge orally granted Turner's motion to dismiss. The docket entry merely reflects that the judge orally granted the motion. Moreover, we reproduce below appellant's entire argument in his brief to this issue:

The lower court erred when it granted Commissioners [sic] Turner's MOTION TO DISMISS. Unlike almost every other judicial officer in the State system, the decision of the Commissioners are incapable of review. Plaintiff should have been allowed to file his class certification motion. Even with the instructive language on this issue from this Court and the Court of Appeals, this Commissioner continues to routinely issue arrest warrants when summons[es] are clearly indicated. Under those circumstances, Mr. Davis is entitled to class certification, injunctive and declaratory relief. *Pulliam v. Allen*, 466 U.S. 5[2]2 [104 S.Ct. 1970, 80 L.Ed.2d 565] (1984).

Appellant apparently contends that the court improperly prohibited him from filing a class certification motion. He does not cite to any factual support for this contention, however. No motion to certify the class appears in the docket entries and, lacking a transcript of the hearing, we cannot ascertain whether the court rejected appellant's motion or stated that it would not consider such a motion. Therefore, even assuming the scanty argument in the brief is adequate to preserve the issue, we lack a sufficient basis to review appellant's contention that he was improperly denied class certification. *See Oxtoby v. McGowan*, 294 Md. 83, 92, 447 A.2d 860 (1982).

In any event, we do not believe that the court erred in granting the motion to dismiss. The memorandum in support of the commissioner's motion to dismiss asserts a single theory: appellant failed to state a claim upon which relief can be granted. In our view, Davis failed to state a claim; the

prospective harm to Davis—fear that he will in the future be arrested pursuant to a warrant rather than a summons—is entirely too speculative to support a claim.[16]

In reaching this result, we are guided by *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). There, a citizen who did not offer resistance was held in a "chokehold," which rendered him unconscious and damaged his larynx. *Id.* at 97–98, 103 S.Ct. at 1662–63. In addition to damages, he sought to enjoin the city from using such a means of restraint, absent a reasonable fear of an immediate danger of deadly force. *Id.* at 98, 103 S.Ct. at 1663. The Court held that the danger to *Lyons* that he would again be stopped for a traffic violation and again subjected to the chokehold was speculative, and did not state a claim:

> "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." Past wrongs were evidence bearing on "whether there is a real and immediate threat of repeated injury."

*Id.* at 102, 103 S.Ct. at 1665 (alteration in original) (citation omitted) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)).

## VIII.

Appellant also claims that the court erred in permitting testimony regarding a prior, unrelated investigation of him, which he characterizes as "character assassination." He refers us to "E. 193–195," which is presumably from the trial transcript. The record extract does not contain complete page numbers, however, and we do not have pages with the numbers referenced above. *See* Md. Rules 8–501, 8–503. Moreover, because DiPino testified to two prior investigations, we

---

16. Counsel for appellant has forwarded to this Court charging documents and arrest warrants purportedly issued in violation of Md. Rule 4–212, which he contends demonstrate that Commissioner Turner engages in a "practice" of disregarding the plain language of the rule. These documents, which are not part of the record, are not properly before us.

cannot be certain we know which one appellant challenges here.

 As to DiPino's testimony concerning the investigation that followed the encounter on the boardwalk in the Spring of 1990, when Davis was riding his bicycle, and which led to appellant's disclosure to DiPino about Sergeant Holtzman, we see no error. It is, of course, well settled that "trial judges have broad discretion in the conduct of trials in such areas as the reception of evidence." *McCray v. State*, 305 Md. 126, 133, 501 A.2d 856 (1985). Moreover, our scope of review on this issue is limited; we defer to the trial court's exercise of discretion, absent abuse. *See State v. Broberg*, 342 Md. 544, 552, 677 A.2d 602 (1996); *North v. North*, 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994) (discussing "abuse of discretion" standard of review).

 Maryland Rule 5–401 states: " 'Relevant evidence' means evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added). Further, Md. Rule 5–402 provides, in part, that, "Except as otherwise provided . . ., all relevant evidence is admissible." In our view, evidence of DiPino's personal contact with Davis in the Spring of 1990 was relevant; her personal knowledge was a key component in the formulation of her belief in May 1991 that Davis knew she was an undercover police officer.[17] The objective standard does not necessarily preclude the admission of evidence pertaining to the officer's fund of personal knowledge.

We are troubled, however, by the admission of DiPino's testimony concerning her initial suspicions of appellant as a drug dealer, much of which was based on rank hearsay, to which repeated objections were lodged. Nevertheless, given appellant's failure to particularize his contention or to provide

---

17. Such evidence, however, is not relevant to the issue we have found dispositive; DiPino did not reasonably believe that appellant knew she was engaged in the performance of her duties.

a proper record extract, we decline to address this matter further.

JUDGMENTS IN FAVOR OF DIPINO VACATED AS TO THE FEDERAL AND STATE CONSTITUTIONAL CLAIMS; CASE REMANDED TO THE CIRCUIT COURT FOR WORCESTER COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

JUDGMENTS IN FAVOR OF DIPINO AND OCEAN CITY ON MALICIOUS PROSECUTION CLAIM VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS; JUDGMENTS IN FAVOR OF DIPINO AFFIRMED WITH RESPECT TO ALL OTHER INTENTIONAL TORT CLAIMS; ALL OTHER JUDGMENTS IN FAVOR OF OCEAN CITY AFFIRMED.

JUDGMENTS IN FAVOR OF COMMISSIONER TURNER AFFIRMED.

DAVIS, DIPINO, AND OCEAN CITY TO SHARE COSTS EQUALLY.

MURPHY, C.J., dissents and files opinion in which
WENNER, EYLER, THIEME and BYRNES, JJ., and
ROBERT F. FISCHER, Judge (retired, Specially Assigned),
join.

MURPHY, Chief Judge, dissenting.

On the basis of the circuit court's non-clearly erroneous findings of fact, we are reviewing judgments entered in a money damages action filed against a police officer who presented a truthful Application for Statement of Charges to a District Court Commissioner. Each of those judgments should be affirmed because at the time appellee filed the Application for Statement of Charges, (1) the Application was simply not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" (2) the constitutional right to "blow the cover" of an undercover officer has not been "clearly established" in Maryland or anywhere else; and (3) the circuit court was not clearly

erroneous in finding that the facts asserted in the Application were true.

### The 1983 Claims

When this case returned to the circuit court, the complaint was amended to include an assertion that appellee's Application contained false and misleading statements. That assertion made summary judgment inappropriate, and required that the trier of fact decide whether appellee had lied to the Commissioner. The issue of qualified immunity, however, was not postponed until the plaintiff proved a constitutional violation. Appellee began the trial "shielded from liability for civil damages insofar as [her] conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The following transpired when appellant's counsel made his closing argument:

THE COURT: As to how [appellant] learned or from who he learned that these officers were actually officers and when he learned it, we went round and round on that. His testimony changed on numerous occasions the bottom line being, that I have a problem with his credibility. I don't have a problem with Sergeant DiPino's credibility, and I don't have a problem with Trooper Brumbley's credibility.

So what I'm telling you is, there is a divergence as to what actually occurred here, and I'm going to base my decision on the testimony of Sergeant DiPino and Trooper Brumbley, because I find them to be the credible witnesses.

So if you want to make your arguments based on that testimony, I'll hear you.

MR. WIMBROW: . . . But once again, I think in the best light of the Defendants' case, you know, she never had probable cause to believe he'd committed a crime.

THE COURT: Why not?

MR. WIMBROW: Why not?

It's not a crime to say—to say the truth. It's not a crime to say, "That person's a lawyer". "That person's a judge". "That person is a police officer." That's not a crime.

THE COURT: Well, according to the Sibiga—I don't know how you say that name, but at 65 Md. Appellate 69: "The elements for obstructing or hindering are a police officer engaged in the performance of his duties."

You would concede that, in fact, they were engaged in the performance of their duties as undercover officers attempting to make a drug buy.

MR. WINBROW: I will concede that. But there is no proof that Mr. Davis knew that they were so engaged at that time. There is absolutely no evidence that he knew they were so engaged at that time.

They have plain clothes on. You can't tell me they're engaged in buying drugs and investigating drugs every minute that they have a pair of jeans and a tee shirt on.

THE COURT: Well, what we're talking about is probable cause.

MR. WINBROW: Oh, I understand.

THE COURT: We're not talking about proof beyond a reasonable doubt. Certainly, Wicomico Street and the Cork Bar are areas where it's well known that drug transactions take place.

MR. WIMBROW: Well known to her. That was her testimony, well known to her. No evidence that Mr. Davis knew that.

And I want to point—

THE COURT: Well, there is evidence that he was familiar with drug transactions . . .

MR. WIMBROW: Assuming all that's true, that doesn't mean—there is no evidence that Mr. Davis knew that she was working that night or even that he knew that Wicomico Street was a high drug area. If it was a high drug area, that does not give any credence to the proposition that she was working.

There's absolutely no evidence—and I know we're talking about probable cause—but there's no evidence at all that she was working.

THE COURT: I think that's sufficient evidence.

\* \* \*

THE COURT: Well, the way I read the case as I got the testimony before me, I have explained to you why I think which testimony is believable to me, and I got the elements of what hindering are. I've already gone through 1 and 2. 3: "Acknowledged (sic)by the accused of facts comprising element number 1 which is that they were police officers." And I know you have to concede that. And 4 was, "Intent to obstruct or hinder the officer by the act or omission constituting element number 2."

The facts as stated by the officers, with several people outside the Cork Bar, numerous people on the street, a conversation with Mr. King who may have been involved because of a confidential report that she read about Kingie's—

MR. WIMBROW: But he doesn't know that. There's no evidence that he knows that. So how can he have an intent to obstruct her investigation of something about which he knows nothing?

THE COURT: Why would he have said it in such a loud voice to do other than that?

MR. WIMBROW: He said it. Well, that's not—you know, he said it because he was having a conversation with King. They said that it was all this noise. Maybe if you accept their testimony—

THE COURT: And I do.

MR. WIMBROW: —— he had to talk over this noise.

THE COURT: No. I think that's a stretch.

I agree with the circuit court's conclusion that appellee's Application did establish probable cause for the issuance of a Statement of Charges. I am also persuaded, however, that

appellant's evidence was insufficient as a matter of law to establish either (1) that the right to "blow the cover" of an undercover officer had been "clearly established" when appellee filed her Application, or (2) that no reasonable law enforcement officer would believe that the information contained in the Application was sufficient to establish probable cause for appellant's arrest.[1]

## I

According to the majority, "knowledge" is an element of the offense with which appellant was charged, and there was no proof of appellant's knowledge that appellee was on duty when they encountered one another; thus appellant should never have been charged because the State would never be able to establish a prima facie case of hindering. As the circuit court pointed out, however, the issue was whether the Application established probable cause. "Only the probability, and not a prima facie showing, of criminal activity, is the standard for probable cause." *Collins v. State*, 17 Md.App. 376, 384, 302 A.2d 693 (1973).

Moreover, nothing in *Cover v. State* requires that the State must prove "direct or actual" knowledge in a hindering case. In "receiving stolen goods" prosecutions (now prosecuted as theft under our consolidated theft statute), the "knowledge" element can be established by proof that the defendant "could reasonably have suspected that the property ... was stolen." *McGlothlin v. State*, 1 Md.App. 256, 262, 229 A.2d 428 (1967). There is no valid reason why the knowledge element in a hindering case cannot be established by proof that the defendant reasonably suspected that he or she was hindering an on duty officer.

In *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court held that police offi-

---

1. An appellate court has the authority to determine "that an issue was decided correctly, albeit for different reasons." *Davis v. DiPino*, 337 Md. 642, 655, 655 A.2d 401 (1995). In appellant's 1983 claim, the "issue" is whether appellee is entitled to qualified immunity.

cers seeking arrest warrants are entitled to qualified immunity, and

> that the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon, supra,* defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, *Leon, supra,* at 923, 104 S.Ct. at 3421, will the shield of immunity be lost.

475 U.S. at 345, 106 S.Ct. at 1098.

It has been "clearly established" that police officers cannot present false or misleading affidavits to magistrates. The law quite properly imposes civil liability on the person who submits an affidavit that either contains a false statement of fact, or omits a material fact in order to create a false impression. Never before now, however, has any court imposed 1983 liability against an officer who presented an affidavit that is true. In the twelve years since the Supreme Court stated that 1983 liability would be imposed on an officer whose request for a warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," no appellate court anywhere has imposed liability under this theory.[2]

If a criminal defendant is arrested on a warrant based on an affidavit that did not establish probable cause for the arrest, (1) any contraband or incriminating evidence found on the defendant's person will be inadmissible at trial, *Collins v. State,* 17 Md.App. 376, 382–383, 302 A.2d 693 (1973); and, absent proof of attenuation and a finding that his or her statement was not "the tainted fruit of the poisonous tree," any incriminating statement made by the defendant will be excluded as well. *Ryon v. State,* 29 Md.App. 62, 82, 349 A.2d 393 (1975), affd., *State v. Ryon,* 278 Md. 302, 363 A.2d 243

---

**2.** In the fourteen years since *Leon* was decided, there have been no reported appellate opinions holding that a criminal defendant was entitled to suppression of evidence under this theory.

(1976). Had appellant been in possession of contraband at the time he was arrested, would that contraband be inadmissible under *Collins?* If, upon reading the warrant, appellant had blurted, "I was sure DiPino was just about to arrest a good friend of mine, and I'm delighted that I screwed up her investigation!" would that incriminating statement be inadmissible under *Ryon?* According to the majority, the answer to each of these questions is "yes." I cannot agree with either answer.

"A close question of probable cause (or the admissibility of information from an informant bearing on probable cause) might be submitted to twenty fair and knowledgeable judges with ten finding one way and ten finding the opposite way and none of them being unreasonable or clearly erroneous. What happens when such a ruling comes to us, or to a suppression hearing judge, for review? Do we simply monitor the system for "error" (which is the basic, though limited, appellate function)? Do we extend due deference to any reasonable conclusion arising out of the gray area or broad discretionary range as something not "clearly erroneous" or a "clear abuse of discretion," even where we ourselves might have concluded otherwise from the same ambiguous predicate? Or do we make a *de novo* determination on these issues?

... *Illinois v. Gates* leaves no room for doubt that reviewing courts, at the appellate level or at the suppression hearing level, have no business second-guessing the probable cause determinations of warrant-issuing magistrates by way of *de novo* determinations of their own. Unless the finding of the magistrate in this regard is "clearly erroneous" or represents "a clear abuse of discretion," it is unassailable. *Illinois v. Gates* makes it equally beyond dispute that this is not a change in the law, but a declaration of preexisting law.

*Ramia v. State,* 57 Md.App. 654, 658–659, 471 A.2d 1064 (1984).

In this case, both the District Court Commissioner and the circuit court concluded that the affidavit was sufficient to

establish probable cause. Under these circumstances, there is a presumption that probable cause existed. *Golino v. City of New Haven,* 950 F.2d 864, 870–871 (2nd Cir.1991). That presumption can be overcome by proof that the affidavit contains a false statement that was necessary to the finding of probable cause. *Id.* Such a presumption, however, has never been overcome in a damage action arising out of an affidavit found to be truthful.

When a factual situation presents a close question of probable cause, the benefit of the doubt belongs to the police officer who submits the close question for a magistrate's decision.

*Jennings v. Joshua Independent School District,* 877 F.2d 313, 318 (5th Cir.1989). The imposition of 1983 liability on a law enforcement officer who presents a truthful affidavit to a judicial officer is contrary to the Supreme Court's preference for warrants, and contrary to sound public policy as well.

## II

The constitutional right that appellee allegedly violated has never been "established," "clearly" or otherwise. We are not dealing with the abstract right of "free speech," but rather with the particularized right to "blow the cover" of an undercover officer.

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

The plaintiff has the burden of proving that a fact specific constitutional right has been "clearly established." *Frohmader v. Wayne,* 958 F.2d 1024, 1027 (10th Cir.1992). This issue is an issue of law, and requires that we examine the law on

that subject as articulated by the United States Supreme Court, by the United States Court of Appeals for the Fourth Circuit, and by the Court of Appeals of Maryland. *Courson v. McMillian*, 939 F.2d 1479, 1498 n. 32 (11th Cir.1991), *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991).

In § 1983 actions where qualified immunity is at issue, it has been the rule that the plaintiff bears the burden of showing that the fact-specific constitutional right allegedly violated was clearly established at the time of the incident since *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), . . .

Under the rule of *Davis v. Scherer*, a defendant is presumed to be immune from damages unless the plaintiff shows that the right allegedly violated was clearly established at the time of the conduct at issue. 468 U.S. at 197, 104 S.Ct. at 3021. . . . If the plaintiff is not expected to make any "showing" except as to what happened factually, leaving it to the court to come up with the relevant universe of authority from which to find whether the law was clearly established, the *Davis* rule would be flipped on its head. *Elder v. Holloway*, 975 F.2d 1388, 1392–1393 (9th Cir.1991).

Of the cases relied on by the majority, only *Cover* was cited in appellant's brief. I point this out not to criticize appellant's counsel (who has represented his client very well), but rather to show why the cases relied on by the majority do not "clearly establish" that Davis had a right to say what he said, the way he said it, on the occasion at issue. There is a very good reason why appellant's counsel cited only one of the cases on which the majority relies: he recognizes that the others do not establish the law that we must apply.

*State v. Jelliffe* was decided by a judge of the Municipal Court of Cleveland, Ohio, whose opinion does not establish the law for Ohio or anywhere else. *Westin v. McDaniel* was decided by a federal district judge, whose opinion does not establish the law for any other district, *Richardson v. Selsky*, 5 F.3d 616, 623 (2nd Cir.1993), and was affirmed in an unpublished opinion that does not establish precedent even for

the 11th Circuit. *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir.1996).

The majority concludes that the circuit court misconstrued *Cover v. State*, 297 Md. 398, 466 A.2d 1276 (1983). I do not agree with that conclusion. Nothing in *Cover*, however, establishes—clearly or otherwise—that a citizen has the right to "blow the cover" of an undercover officer. The Court of Appeals did not reverse *Cover*'s conviction on the ground that a citizen has a constitutional right to warn a fellow citizen that he is under police surveillance. Reversal was based on the narrow ground that the State's evidence was insufficient to establish that the defendant ever made any such attempt. 297 Md. at 414–415, 466 A.2d 1276. Moreover, although it had the opportunity to do so, the *Cover* court did not reject the proposition that a hindering conviction can be based on proof that the defendant committed an intentional act that made it more difficult for the police to carry out their duty. Id. at 409–412, 466 A.2d 1276.

> For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.

*Lassiter v. Alabama A & M University*, 28 F.3d 1146, 1150 (11th Cir.1994) (emphasis in the opinion). If there really is a specific, factually defined constitutional right to "blow the cover" of an undercover officer, it is certain that such a right had not been "clearly established" when appellee presented her Application to the Commissioner.

### III

Even if the right to "blow the cover" of an undercover officer had been established when appellee presented her Application to the District Court Commissioner, and even if that Application did not establish probable cause for appellant's arrest, this court should nonetheless affirm the judgments of the circuit court. To determine the issue of

appellee's 1983 liability, we ask "not whether the affidavit establishes probable cause, but rather whether the officer had an objectively reasonable belief that it established probable cause." *Thompson v. Reuting,* 968 F.2d 756, 760 (8th Cir.1992).

If the material facts and the reasonable inferences drawn from those facts disclose that a reasonable officer could have believed that his or her actions did not violate the clearly established right, the defendant is entitled to qualified immunity on summary judgment. See *Pritchett [v. Alford,]* 973 F.2d [307] 312–13 [(4th Cir.1992)].
*Smith v. Reddy* 101 F.3d 351, 357 (4th Cir.1996).

Because of the circuit court's non-clearly erroneous factual finding that her testimony was truthful, appellee is entitled to immunity as long as officers of reasonable competence could disagree on whether her Application was sufficient to establish probable cause. *Malley v. Briggs,* 475 U.S. at 341, 106 S.Ct. at 1096. Appellant was therefore required to prove that no reasonably well trained police officer would have attempted to obtain an arrest warrant on the basis of the facts contained in the Application at issue. Such proof cannot be inferred from the record before us. Whether no reasonably well trained officer would have done what appellee did is a complicated question that is not a matter of common knowledge or experience. Appellant's failure to produce expert testimony on this issue is fatal to his 1983 claim.

## The State Law Claims

To prevail on his Maryland law claims, appellant was required to prove that appellee lied to the District Court Commissioner. Under Maryland law, when a person presents truthful information in an Application for Statement of Charges, he or she is simply not liable in damages to the person who gets arrested and/or prosecuted on the basis of that truthful information. Malice is absent as a matter of law if the material facts asserted by the applicant are true and correct. *Mertens v. Mueller,* 122 Md. 313, 322–323, 89 A. 613 (1914), *Wood v. Palmer Ford,* 47 Md.App. 692, 701, 425 A.2d

671 (1981), *aff'd.* in part and *rev'd.* in part on other grounds, 298 Md. 484, 471 A.2d 297 (1984), on remand 65 Md.App. 390, 500 A.2d 1055 (1985).

Because the circuit court found that the facts asserted in the Application were true, and that finding was not clearly erroneous, we should affirm each of the judgments entered on appellant's state law claims.